FILED
2011 Dec-06  PM 01:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION**

| | |
|---|---|
| **CARLA MAURICE MOORE, et al.,** | ] |
| | ] |
| **Plaintiffs,** | ] |
| | ]            **CV-09-BE-2367-M** |
| **v.** | ] |
| | ] |
| **GUNTERSVILLE, CITY OF, et al.,** | ] |
| | ] |
| **Defendants.** | ] |

**MEMORANDUM OPINION**

This civil rights case comes before the court on Defendants Investigator Mike Turner and

Officer Andrew Burnham's Motion to Dismiss (doc. 62) and their Brief in Support (doc. 63). The

plaintiffs filed a brief responding to the defendants' motion (doc. 72). The defendants did not file

a reply within the time allowed in the briefing schedule, and the motion is ripe for consideration.

**I. PROCEDURAL HISTORY**

Carla Maurice Moore, the mother and next friend of minor C.H., initiated this lawsuit as a

pro se plaintiff on November 20, 2009. The case was reassigned to this court (doc. 3), and this

court granted leave for Ms. Moore to proceed in forma pauperis and ordered her to file a

complaint that complied with the Federal Rules of Civil Procedure (doc. 4). Ms. Moore filed the

first amended complaint on December 14, 2009, again as a pro se plaintiff (doc. 5). In response

to this filing, this court ordered Ms. Moore to either obtain a lawyer to represent her minor son or

request this court to appoint an attorney for him by January 4, 2010 (doc. 6).

Ms. Moore requested a lawyer (doc. 7), and on April 1, 2010, Wendy Crew filed a notice

1

of appearance on behalf of Ms. Moore. Ms. Moore then filed her second amended complaint, which added several additional plaintiffs and defendants (doc. 11). The complaint specifically added the City of Guntersville, Mayor Robert L. Hembree, Guntersville Chief of Police Jim Peterson, Officer Karl Keller, and Lieutenant Beau Cagle as defendants. In June, 2010 the defendants filed several motions to dismiss (docs. 16, 18, 26, and 27). The plaintiffs filed a response to all four motions to dismiss on July 19, 2010 (doc. 33) and filed a motion to amend the complaint a third time on September 16, 2010 (doc. 34).

On April 7, 2011, this court scheduled a hearing for May 24, 2011 on the motions to dismiss and the motion to amend (doc. 35). Based on the hearing, this court dismissed the City of Guntersville and Mayor Hembree without prejudice, granted in part and denied in part the other defendants' motions to dismiss, and granted leave for the plaintiffs to file their amended complaint (doc. 38). The plaintiffs filed their third amended complaint on June 14, 2011, adding some plaintiffs while terminating others (doc. 39). The third amended complaint named all the original defendants, including the City of Guntersville and Mayor Hembree, and added two additional defendants, Investigator Mike Turner and Officer Andrew Burnham.

In response to the third amended complaint, all the defendants filed motions to dismiss. Defendants City of Guntersville, Mayor Hembree, and Chief of Police Peterson each filed individual motions to dismiss in June, 2011 (docs. 49, 51, and 57, respectively). Defendants Lieutenant Cagle and Officer Keller filed a joint motion to dismiss on June 30, 2011 (doc. 58). Defendants Officer Burnham and Investigator Turner filed a joint motion to dismiss on July 5, 2011. All the motions to dismiss filed by the City of Guntersville, Mayor Hembree, Chief of Police Peterson, and by Lieutenant Cagle and Officer Keller were concise and raised the same

defenses as the motions to dismiss directed towards the second amended complaint. Officer

Burnham and Investigator Turner's motion to dismiss, however, was much more substantive and

pled the defense of qualified immunity, among others.

Because all defendants except Officer Burnham and Investigator Turner raised the same

defenses on their second motions to dismiss, this court required no additional briefing from the

parties on these motions; however, this court ordered a full briefing schedule on Officer Burnham

and Investigator Turner's motion to dismiss. This court responded to all motions to dismiss,

except for Officer Burnham and Investigator Turner's, with concise orders granting in part and

denying in part the defendants' motions to dismiss (docs. 66, 67, 68, and 69). After ruling on the

motions to dismiss the third amended complaint—with the exception of Investigator Turner and

Officer Burnham's motion currently before the court—all defendants remained in the case. The

court now addresses the remaining motion to dismiss.

## II. STATEMENT OF FACTS             .

The plaintiffs' complaint arises out of numerous instances of alleged police misconduct

starting in October, 2008 and lasting until May, 2011. Although the complaint alleges facts

implicating a variety of defendants, including the Mayor of the City of Guntersville and the Chief

of Police, this memorandum opinion will focus on the facts that form the basis of the counts

alleged against Investigator Turner and Officer Burnham.

At the motion to dismiss stage, the allegations of the complaint must be taken as true.

*Lotierno v. Woman's World Medical Center, Inc.*, 278 F.3d 1180, 1182 (11th Cir. 2002). The

court accepts as true the following facts from the complaint, although they may not be the facts

proven at trial.

In October, 2008, Plaintiff Teylor Peele, who at the time was 16 years old, sat in a car in her own neighborhood with two of her 14-year-old girlfriends. The girls were talking to some boys who were standing outside the car in the early evening, including plaintiff Joshua Marks, also a minor at that time, when several police cars came up to the youths. Several police officers, including Investigator Turner, exited the police cars with their guns drawn. The police officers put their guns in the girls' faces while shouting at them to be quiet and not ask any questions. The police officers also forced the boys to the ground while pointing guns at them, and then proceeded to search them. Ms. Peele's cell phone rang while the officers were pointing their guns at her. The officers refused to allow her to answer the call, which was from her mother. The complaint does not allege how this encounter ended, other than that the relatives of the minor children went to the police station the next day to report the incident to the Chief. The complaint also is not clear on the exact role that Investigator Turner had, as it did not attribute the police officers' conduct among the individual officers present.

On February 25, 2010, Investigator Turner, along with two officers, approached plaintiff Joshua Marks, no longer a minor at that time, while he was on the porch of his Aunt's house. Mr. Marks was knocking on the door of the house when the officers, including Investigator Turner, approached him with guns drawn. The officers continued to keep their guns aimed at Mr. Marks while Investigator Turner patted him down. When the officers found nothing, they left the property and filed no charges against Mr. Marks.

On June 12, 2010, plaintiffs H.G.M. and M.H., two female minors, were walking to a friend's house when they noticed a rapidly approaching black Dodge Charger, later determined to be an unmarked police car. The car startled the girls and they ran into a patch of tall grass near

4

the street. Two police officers, including Officer Burnham, walked towards the girls while screaming and using profanity, and used their flashlights to direct the girls to come out of the grass. M.H. eventually came out of the grass. The complaint does not clearly state whether H.G.M. did as well, although both H.G.M. and M.H. allege that they repeatedly told the officers that no other people were in the area. The officers nevertheless detained the girls in the Charger. Shortly after the officers detained the girls, about four to five other police vehicles containing eight to ten Guntersville police officers and police dogs arrived at the scene with sirens flashing. H.G.M.'s parents later arrived on the scene and asked the officers to release H.G.M. to them. An unidentified police officer told H.G.M.'s parents that they were taking the girls to jail. The Guntersville police officers then transferred the girls to the jail. The complaint does not precisely allege Officer Burnham's role in this incident, other than being one of the initial officers to approach the girls.

After the girls had been transferred to the jail, H.G.M.'s parents tried, without success, to reach the Mayor. When the parents arrived at the jail the parents spoke with the City Attorney. After the parents involved the City Attorney and a Councilwoman from the City of Guntersville, the girls were released to their relatives. The police never gave a reason for the detention and never filed charges against the girls.

The last incident alleged in the complaint involving either of these defendants occurred in May, 2011. J.T., a 10-year-old minor, was at a relative's house when multiple Guntersville police came into the house, including Investigator Turner. The police officers held guns drawn on J.T. and others. Investigator Turner took J.T. to a separate room, patted him down, and searched him. When J.T. asked Investigator Turner if he could use the bathroom, Investigator Turner responded

that he would have to watch J.T. do so. The complaint does not clearly state whether J.T. actually

used the bathroom in Investigator Turner's presence. Investigator Turner then made J.T. remove

his socks and shoes and proceeded to search them. After the search, Investigator  Turner allowed

J.T. to leave and return to his house. No charges were filed against J.T.

## III. COUNTS ALLEGED IN THE COMPLAINT

The plaintiffs allege that the officers' conduct violated their Fourth Amendment rights

through unlawful searches and seizures, and through the use of excessive force. The plaintiffs

also allege the state law tort of outrage, state law assault, and state law false imprisonment

claims. The defendants raise qualified immunity as to the federal claims, state law immunity as to

the state law claims, and further allege that the plaintiffs have failed to state a claim for the tort of

outrage.

## IV. STANDARD OF REVIEW

A Rule 12(b)(6) motion to dismiss attacks the legal sufficiency of the complaint.

Generally, the Federal Rules of Civil Procedure require only that the complaint provide "'a short

and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's

claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957)

(quoting Fed. R. Civ. P. 8(a)).  A plaintiff must provide the grounds of his entitlement, but Rule

8 generally does not require "detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 555 (2007) (quoting *Conley*, 355 U.S. at 47).   It does, however, "demand[ ] more than an

unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal* 556 U.S. ___,

129 S.Ct. 1937, 1949 (2009).   Pleadings that contain nothing more than "a formulaic recitation

of the elements of a cause of action" do not meet Rule 8 standards nor do pleadings suffice that

are based merely upon "labels or conclusions" or "naked assertions" without supporting factual allegations. *Twombly*, 550 U.S. at 555, 557.

The Supreme Court explained in *Twombly* that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S. Ct. at 1948 (quoting and explaining its decision in *Twombly*, 550 U.S. at 570). To be plausible on its face, the claim must contain enough facts that "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. Although "[t]he plausibility standard is not akin to a 'probability requirement,'" the complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

The Supreme Court has recently identified in *Iqbal* "two working principles" for the district court to use in applying *Twombly's* facial plausibility standard. The first principle is that, in evaluating motions to dismiss, the court must assume the veracity of *well-pleaded factual* allegations; however, the court does not have to accept as true legal conclusions even when "couched as [] factual allegation[s]" or "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 129 S. C. at 1949–50. The second principle is that "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 1150. Thus, under prong one, the court determines the factual allegations that are well-pleaded and assumes their veracity, and then proceeds, under prong two, to the task of determining the claim's plausibility given the well-pleaded facts. That task is "context-specific"

and must permit the court, based on its "judicial experience and common sense. . . to infer more than the mere possibility of misconduct." *Id.*  If the court determines that well-pleaded facts, accepted as true, do not state a claim that is plausible, the claim must be dismissed.  *Id.*

Although the Eleventh Circuit once required plaintiffs to meet a heightened pleading standard in § 1983 cases where a defendant raised qualified immunity, the Eleventh Circuit recently held that *Iqbal* obviates the need for a heightened standard. *See Randall v. Scott*, 610 F.3d 701, 708–10 (11th Cir. 2010) ("After *Iqbal* it is clear that there is no 'heightened pleading standard' as it relates to cases governed by Rule 8(a)(2), including civil rights complaints."). Accordingly, the plaintiffs must only meet the single *Iqbal* pleading standard to survive a motion to dismiss.

## IV. DISCUSSION

This analysis will begin with a discussion of the plaintiffs' federal claims based in alleged violations of the Fourth Amendment, and defendants Officer Turner and Investigator Burnham's qualified immunity defense in response. As an initial matter, this court notes that the alleged violation of the plaintiffs' Fourth Amendment rights does not, by itself, create a cause of action. Instead, 42 U.S.C. § 1983 provides a remedy to parties deprived of constitutional rights by an official's abuse of his position. *See Monroe v. Pape*, 365 U.S. 167, 172, 81 S. Ct. 473, 476 (1961). As defendants in this case point out, the plaintiffs have not specifically pled their civil claims for the Fourth Amendment violations under § 1983.

In the interest of judicial economy, and because defendants pragmatically assume that the claims were brought under § 1983 in their brief, this court will not impose the draconian sanction of dismissal for the plaintiffs' omission of the mechanism for civil liability for a constitutional

8

violation. Indeed, a simple one sentence amendment to the complaint would remedy the oversight. The court will thus recognize for the purposes of this opinion that the action was brought under § 1983.

**Plaintiffs' Fourth Amendment Claims**

*Qualified Immunity*

Defendants Investigator Turner and Officer Burnham raise qualified immunity as a defense to the claims alleged under the Fourth Amendment. Qualified immunity protects government officials performing discretionary functions from suit in their individual capacities unless the official violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citation omitted). "Because qualified immunity is a defense not only from liability, but also from suit," the court recognizes the importance of "ascertain[ing] the validity of a qualified immunity defense as early in the lawsuit as possible." *Id.* (citing *GJR Invs., Inc., v. County of Escambia*, 132 F.3d 1359, 1370 (11th Cir. 1998)).

To receive qualified immunity, a government official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002). Government officials act within the scope of their discretionary authority if "the actions were (1) 'undertaken pursuant to the

performance of [their] duties' and (2) 'within the scope of [their] authority.'" *Lenz v. Winburn*, 51 F.3d 1540, 1545 (11th Cir. 1995) (quoting *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1998)).

"Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). The Supreme Court has articulated a two-part test to determine whether qualified immunity is appropriate. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). First, the court must ask this threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Second, "[i]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.* (citing *Saucier*, 533 U.S. at 201).

*The Facts Alleged by Plaintiffs Show Violations of the Fourth Amendment*

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744 (2002). Seizures by government officials, even if only brief detentions, must be founded upon an objective justification. *See United States v. Mendenhall*, 446 U.S. 544, 551, 100 S. Ct. 1870 (plurality) (1980).

Certainly, "not every encounter between law enforcement officers and a citizen in a public place constitutes a seizure within the meaning of the *Fourth Amendment*." *United States v.*

*De La Rosa*, 922 F.2d 675, 678 (11th Cir. 1991) (citing *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). The societal pressure to stop and speak with law enforcement is not sufficient, by itself, to implicate the Fourth Amendment in a police-citizen encounter. *See United States v. Baker*, 290 F.3d 1276, 1278 (11th Cir. 2002). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen, may we concluded that a 'seizure' has occurred." *See Baker*, 290 F.3d at 1278 (citing *Terry*, 392 U.S. at 19 n. 16). The test for Fourth Amendment seizures, adopted by the Supreme Court after *Terry*, is whether "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall*, 446 U.S. at 554, 100 S. Ct. 1870 (1980) (plurality); *see Florida v. Royer*, 460 U.S. 491, 502, 103 S. Ct. 1319 (1983) (restating the *Mendenhall* test in a majority opinion); *see also Terry v. Ohio*, 392 U.S. 1, 16, 88 S. Ct. 1868 (1968) ("It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person.").

The Court in *Mendenhall* gave examples of what might constitute a seizure, including "the presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *See Mendenhall*, 446 U.S. at 554. The Court has also suggested other factors indicative of a seizure, including in relevant part, the suspect's age, education and intelligence, and the length of the suspect's detention and questioning. *See United States v. Puglisi*, 723 F.2d 779, 783 (11th Cir. 1984) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S. Ct. 2041, 2047 (1973)).

Traditionally, law enforcement needed to have probable cause for a seizure to be

11

reasonable under the Fourth Amendment. *See Croom v. Balkwill*, 645 F.3d 1240, 1246 (11th Cir. 2011). In *Terry*, however, the Supreme Court recognized that certain types of *limited* detentions lacking attributes of a full blown arrest could be justified by less than probable cause. *See Terry*, 392 U.S. at 20, 27. *Terry* and its progeny make clear that "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S. Ct. 673 (2000). Thus, two broad categories of seizures now exist for Fourth Amendment purposes: brief seizures or investigatory detentions, requiring only reasonable suspicion, and full-scale arrests, requiring probable cause. *See United States v. Perez*, 443 F.3d 772, 777 (11th Cir. 2004).

Whether a seizure is merely an investigative stop or an arrest depends on the degree of intrusion considering the circumstances; no brightline test exists. *See United States v. Blackman*, 66 F.3d 1572, 1576 (11th Cir. 1995). If a police officer is not careful, a valid *Terry* stop may mature into a full-blown arrest prior to the development of probable cause. *See United States v. Acosta*, 363 F.3d 1141, 1145 (11th Cir. 2004). To assist in more objectively drawing the line between a *Terry* stop and an arrest, the Eleventh Circuit has found four non-exclusive factors for courts to apply: (1) "the law enforcement purposes served by the detention"; (2) "the diligence with which the police pursue the investigation"; (3) "the scope and intrusiveness of the detention"; and (4) "the duration of the detention." *See Acosta*, 363 F.3d at 1146.

In this case, if the plaintiffs can prove the facts alleged in the complaint, Officer Burnham and Investigator Turner's alleged conduct constituted a seizure. Each incident alleged involved the clear hallmarks of a seizure suggested by the Court in *Mendenhall*—the presence of multiple

officers, physical touching of the minors, and display of weapons. In each of these incidences, a reasonable person would undoubtedly have felt that he or she was not free to leave. This court's conclusion that the officers seized the plaintiffs is only strengthened when factoring in the age of the plaintiffs, which in one incident was as young as ten years old. A minor child facing a police officer with guns drawn would not have believed he could leave the scene. *See Mendenhall*, 446 U.S. at 554.

Ordinarily, this court would then have to determine whether the seizure was an investigative stop or an arrest to decide if the seizures were reasonable, as law enforcement must show reasonable suspicion for the former while probable cause is required for the latter. This court need not make that determination at this stage, however, because the facts alleged do not show any basis for the lesser standard of reasonable suspicion.[1]

"[T]he concept of reasonable suspicion is somewhat abstract," and whether a police officer had reasonable suspicion must be viewed in the totality of the circumstances. *See United States v. Williams*, 619 F.3d 1269, 1271 (11th Cir. 2010) (citing *United States v. Arvizu*, 534 U.S. 266, 273–74, 122 S. Ct. 744 (2002)). To show reasonable suspicion, an officer "must be able to articulate more than an 'inchoate and unparticularized suspicion or 'hunch' of criminal activity.'" *Illinois v. Wardlow*, 528 U.S. 119 at 123–24. "[W]hile 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for

---

[1] That the court focuses its inquiry on reasonable suspicion is not to say that the court finds that the plaintiffs in this case were subjected only to an investigatory stop, and not an arrest. Rather, the court declines to engage in this fact-intensive analysis at the motion-to-dismiss stage given the incomplete and potentially one-sided descriptions of these incidences alleged in the complaint

making the stop." *See id.* at 123 (citing *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581 (1989)). In applying this abstract standard, courts have identified factors that may indicate reasonable suspicion—for example, presence in a high crime area, or flight upon seeing the police. *See, e.g.*, *United States v. Williams*, 619 F.3d 1269, 1271 (11th Cir. 2010) (finding an officer had reasonable suspicion to conduct an investigative stop when he heard a gunshot and saw a lone vehicle hurriedly pulling out of a high-crime housing project in the middle of the night); *United States v. Hunter*, 291 F.3d 1302, 1306–07 (11th Cir. 2002) (finding the defendant's presence in a high crime area, proximity to illegal gambling activities, flight from the police, and visibility of a suspicious bulge facts supporting reasonable suspicion). When applying this standard to the facts as alleged in the complaint, the court concludes that the police officers did not have any minimal level of objective justification in seizing the plaintiffs. The court recognizes, however, that at the initial pleading stage, it has not heard the defendants' version of events.

The October, 2008 Incident Involving Plaintiffs Peele and Marks

This incident occurred during the early evening when Ms. Peele was sitting with some other girls in a car, talking with Mr. Marks and some other boys standing outside the car. The facts do not indicate that the plaintiffs were engaged in any conduct that would give rise to reasonable suspicion of criminal conduct. Although the complaint is thin on facts, any reasonable inference must be construed in favor of the plaintiffs. This court will not assume facts that would justify the police officers' conduct.

In this incident, multiple officers, including Investigator Turner appeared on the scene brandishing assault rifles. These facts meet the *Mendenhall* definition for a seizure, especially

when considering the age of the plaintiffs. Furthermore, nothing in the facts alleged indicates any basis for reasonable suspicion. Accordingly, because the police allegedly seized the minors without any minimal objective justification, the seizure was unreasonable and in violation of the Fourth Amendment, at least, based on the facts as alleged in the complaint.

The February, 2010 Incident Involving Plaintiff Marks

This incident involved multiple officers coming up to Mr. Marks while he was on the porch of his aunt's house, knocking on the door. The complaint does not allege any facts regarding the situation other than the time and location. The officers' conduct of detaining Mr. Marks at gun point, and the pat-down incident to the detention, was, at least, a *Terry* investigative stop, which requires reasonable suspicion. Because the complaint states no facts indicating reasonable suspicion, this alleged detention also apparently violated the Fourth Amendment.

The June 12, 2010 Incident Involving Plaintiffs H.G.M. and M.H.

On the evening of June 12, 2010, an unmarked police car approached the minor plaintiffs, frightening them and causing them to run into the bushes. The facts do not allege that the officers brandished their weapons in this incident, although the officers screamed and used profanity, and eventually detained the minors in the back of a police car, with other officers arriving on the scene soon after the minors were detained in the police car.

Although seeing people run into the tall grass to hide upon approach may provide a stronger basis for reasonable suspicion than the other incidences alleged, albeit probably not enough to meet the minimal level of objective justification required for the stop, the scope of the investigatory stop was nevertheless excessive in relation to the basis for the stop. *See Florida v.*

*Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319 (1983) (explaining that under the Fourth Amendment "[t]he scope of a detention must be carefully tailored to its underlying justification"); *Jessup v. Miami-Dade Cty.*, 2011 U.S. App. LEXIS 18361 (11th Cir. 2011 Mar. 17, 2000) (determining that once police officers learned no further basis for reasonable suspicion existed after an initial *Terry* stop, they could no longer lawfully continue any detention); *Croom*, 645 F.3d at 1251 (noting that *Terry* stops must "cease once law enforcement's reasonable, articulable suspicions of [detainee are] allayed"). Nothing in the complaint demonstrates that the officers had any reason to continue to detain the H.G.M. and  M.H. after they had stepped out of the grass. Thus, the complaint sufficiently states that the police officers, including Investigator Turner, unreasonably seized the plaintiffs H.G.M. and M.H.

The May, 2011 Incident Involving J.T.

In this incident, the police officers entered a house where J.T. was visiting a relative, three doors down from his family's house. Upon entering the house, the police officers held their guns drawn on J.T., took him to a separate room, and patted him down and searched him.

Although this conduct would constitute a seizure under the *Mendenhall* test, the Supreme Court has held that "temporary detentions by law enforcement of a premises' occupants while those premises are being searched pursuant to a search warrant" is an exception to the Fourth Amendment requirement of probable cause. *See Muehler v. Mena*, 554 U.S. 93, 100–02, 125 S. Ct. 1465 (2005) (holding that law enforcement acted reasonably when detaining a non-suspect occupant of residence in handcuffs for up to three hours)*; Michigan v. Summers*, 452 U.S. 692, 705, 101 S. Ct. 2587 (1981) (holding that "for Fourth Amendment purposes, . . . a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to

detain the occupants of the premises while a proper search is conducted") (footnote omitted). The Supreme Court confirmed in *Mena* that this exception is a categorical rule, and not to be applied on a case-by-case basis. *See Mena*, 544 U.S. at 98.

The complaint, however, does not state any reason for the officers' entry into the house. Viewing the facts in the light most favorable to the plaintiff, at this stage this court must assume that the police officers' entry into the house was done without a warrant. Accordingly, because the police officers, including Investigator Turner, seized J.T. without reasonable suspicion, the complaint sufficiently states a violation of J.T.'s Fourth Amendment rights.

*The Plaintiffs' Fourth Amendment Rights were Clearly Established*

After determining that the plaintiffs' alleged facts sufficiently plead violations of their constitutional rights, the next step in the qualified immunity analysis is to determine whether these rights were clearly established. The objective of qualified immunity is to ensure that defendants "'reasonably can anticipate when their conduct may give rise to liability' . . . by attaching liability only if '[t]he contours of the right [violated are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *United States v. Lanier*, 520 U.S. 259, 270, 117 S. Ct. 1219 (1997). The "contours of the right" may be clearly established by a specific case holding that the right was violated under materially similar facts; however, the Court has also recognized that a constitutional rule may sometimes apply with such "obvious clarity" that an official would not be entitled to qualified immunity notwithstanding the absence of a specific case finding the conduct unlawful. *See Gray v. Bostick*, 458 F.3d 1295, 1306 (11th Cir. 2006) ("Even in the absence of factually similar case law, an official can have fair warning that his conduct is unconstitutional when the constitutional violation is obvious . .

17

."); *Bashir v. Rockdale Cty.*, 445 F.3d 1323, 1330–31 (11th Cir. 2006) (citing *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034 (1987)).

The Eleventh Circuit has recognized that "[t]he Fourth Amendment's general proscription against 'unreasonable' seizures seldom puts officers on notice that certain conduct is unlawful under the circumstances." *See Gray*, 458 F.3d at 1307. Nevertheless, the Eleventh Circuit has concluded on "rare occasion" that Fourth Amendment principles make a constitutional violation obvious. *See Gray*, 458 F.3d at 1307.  In the context of *Terry* investigative stops, the Eleventh Circuit has explained that "[w]hen an officer asserts qualified immunity, the issue is not whether reasonable suspicion existed in fact, but whether the officer had 'arguable' reasonable suspicion to support an investigatory stop." *See Jackson*, 206 F.3d at 1166 (internal citations omitted).

The Eleventh Circuit has denied qualified immunity to officers on unreasonable seizure claims in more than one occasion. In *Jackson v. Sauls*, 206 F.3d 1156 (11th Cir. 2000), three police officers followed a blue Pontiac that obeyed all traffic laws and whose passengers exhibited no signs of nervousness. The Pontiac was headed to a motorcycle shop where one of the passengers had left his motorcycle for repairs. After the Pontiac pulled into the motorcycle shop parking lot the three officers, who were wearing street clothes and did not have their police badges visible, approached the shop with their guns drawn, initiating a shootout between the Pontiac passengers, shop owner, and police officers. One of the passengers died as a result, and the passengers sued the police officers, asserting illegal stop claims under § 1983. *See Jackson*, 206 F.3d at 1159–67. The Eleventh Circuit found that, when the facts were construed in the light most favorable to the plaintiffs, the officers did not have even an arguable basis for their investigation. *See Jackson*, 206 F.3d at 1166.  The Eleventh Circuit, thus, concluded that the

18

district court correctly denied the defendants' motions for summary judgment on their qualified immunity defenses. *See id.*

Similarly, in *Jessup v. Miami-Dade County*, 2011 U.S. App. LEXIS 18361 (11th Cir. Sep. 1, 2011), the Eleventh Circuit reversed the district court's grant of summary judgment and denied qualified immunity on a § 1983 claim asserting violations of the Fourth Amendment. *See id.* at *14–15. In that case, the police officers drove to the plaintiff's boyfriend's house to investigate a report about a stolen basketball, and stopped the plaintiff and her boyfriend when they were out in the yard. After the officers became aware that no basketball had been stolen, they nevertheless prolonged the stop, provoking the plaintiff to verbally protest and ultimately culminating in her arrest. *See id.* at *4–6. The Eleventh Circuit denied qualified immunity to the police officers, stating "[i]t is clearly established that an arrest made without probable cause violates the Fourth Amendment." *See id.* at *14 (quoting *Redd v. City of Enterprise*, 140 F.3d 1378, 1382 (11th Cir. 1998)); *see also Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996) ("A warrantless arrest without probable cause violates the *Fourth Amendment* and forms a basis for a *section 1983* claim.") (emphasis in original). Because the officers had absolutely no basis for prolonging the *Terry* stop after they determined the basketball had not been stolen, they did not have even "arguable" probable cause. *See Jessup*, at *14–15; *see also Thornton v. City of Macon*, 132 F.3d 1395, 1399–1400 (11th Cir. 1998) (denying qualified immunity because police officers did not have probable cause to arrest plaintiff for obstruction of justice when plaintiff was only refusing to return a mattress to an ex-girlfriend).

This court finds that the plaintiffs' alleged facts fit one of the "rare occasions" where Fourth Amendment principles make constitutional violations obvious. As detailed above, the

19

Supreme Court's Fourth Amendment jurisprudence has made very clear that police officers must have some minimal objective justification to detain a person, even for a brief investigative stop. None of the incidences alleged at the pleading stage indicate the police had any justification, and certainly not any basis for reasonable suspicion. Although discovery may yield facts demonstrating some level of justification for the officers' conduct, at this motion to dismiss stage this court will deny qualified immunity as to the Fourth Amendment claims without prejudice.

*Plaintiffs' Fourth Amendment Excessive Force Claims*

The plaintiffs also plead that the officers' conduct violated their Fourth Amendment rights through the use of excessive force. The Eleventh Circuit has noted, however, that "a claim that any force in an illegal stop or arrest is excessive is subsumed in an illegal stop or arrest claim and is not a discrete excessive force claim." *See Bashir v. Rockdale Cty.*, 445 F.3d 1323, 1331 (11th Cir. 2006); *see also Gray v. Bostic*, 458 F.3d 1295, 1304 (11th Cir. 2006) ("[Plaintiff] argues that [defendant] used excessive force in detaining her because he lacked a right to detain her at all. Therefore, her excessive force claim is not an independent claim, but rather is subsumed in her illegal seizure claim.").

Although the plaintiffs' complaint, as pled, precludes a separate excessive force claim, the court will not dismiss the plaintiffs' claim at this juncture. The court acknowledges the possibility that the defendants may be able to produce evidence during discovery demonstrating that the police officers lawfully seized the children. If the defendants can prove at a later point in this case that the detentions were lawfully made, the plaintiffs' excessive force claims would no longer be subsumed into their unlawful search and seizure claims, and at that point the plaintiffs may be able to maintain the excessive force claim as a discrete violation of the Fourth

Amendment. But this court advises the plaintiffs that if they prove that the seizures were

unlawful, they cannot maintain a separate discrete excessive force claim.

**Plaintiffs' State Law Claims**

In addition to the plaintiffs' claims that Investigator Turner and Officer Burnham violated

the Fourth Amendment, the plaintiffs also assert a state law claim for the intentional tort of

outrage against both defendants, a state law assault claim against Investigator Turner only, and a

state law false imprisonment claim against both defendants. Investigator Turner and Officer

Burnham raise state law immunity as a defense to all claims, and further argue that the plaintiffs

have not stated a claim for the intentional tort of outrage.

*State law immunity*

The defendants assert peace officer immunity under state statute, which provides that

[e]very peace officer . . . who is employed or appointed pursuant to the
Constitution or statutes of this state. . . shall at all times be deemed to be officers
of this state, and as such shall have immunity from tort liability arising out of his
or her conduct in performance of any discretionary function within the line and
scope of his or her law enforcement duties.

Ala. Code. § 6-5-388(a).

This immunity shields a peace officer from suit in his or her personal capacity for claims

based upon "exercising judgment in the enforcement of the criminal laws of this state, including

but not limited to, law-enforcement officers' arresting or attempting to arrest persons . . . ." *See*

*Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000) (restating the test for state agent immunity);

*Ex parte City of Tuskegee*, 932 So. 2d 895, 904 (Ala. 2005) (explaining that the restatement in

*Cranman* "now governs the determination of whether a peace officer is entitled to immunity

under § 6-5-338(a)"). No immunity exists, however, "when the [peace officer] acts willfully,

maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." *See Cranman*, 792 So. 2d at 405.

Neither party has provided legal authority explaining what conduct would meet the exception to peace officer immunity, but at least two federal district court cases have denied peace officer immunity based on this exception. In *Stovall v. Allums*, 2005 U.S. Dist. LEXIS 29146 (M.D. Ala. Aug. 16, 2005), the court, on a motion for summary judgment, denied state-agent immunity to a police officer when the officer arrested a civilian who spoke critically about the officer to another civilian in the officer's presence. The court explained that the arrest "was unjustified and supported an inference of malice." *See Stovall*, 2005 U.S. Dist. LEXIS 29146, at *45. Similarly, the court in *Walker v. Briley*, 140 F. Supp. 2d 1249 (N.D. Ala. 2001) held in a motion for summary judgment that when the facts were viewed in the light most favorable to the plaintiff, a jury could find malice and bad faith when an officer arrested a person with no grounds to believe that the person had committed an offense. *See Walker*, 140 F. Supp. 2d at 1263 ("The evidence . . . suggests that [the officer] had no grounds to believe that [the plaintiff] had committed any offense whatsoever but rather did not like [the plaintiff] questioning [the officer's] authority or suggesting racist motivations.").

The case against Investigator Turner and Officer Burnham is analogous to these two cited federal court cases. Based on the facts as pled in the third amended complaint, the officers had no justification, neither reasonable suspicion nor probable cause, to detain or seize the plaintiffs. Under these circumstances, this court finds that the plaintiffs have pled facts sufficient to allege that the officers' conduct was malicious and in bad faith. Therefore, Investigator Turner and Officer Burnham's motion to dismiss on the grounds of qualified immunity is due to be denied.

*The tort of outrage*

Investigator Turner and Officer Burnham assert that the plaintiffs have not sufficiently pled the tort of outrage, arguing that Alabama has only recognized conduct supporting the claim of outrage in three areas, which do not include the officers' conduct in this case. Two other defendant police officers, Lieutenant Beau Cagle and Officer Karl Keller, also raised this defense in their motion to dismiss the third amended complaint (doc. 59). This court, in its order addressing that motion, denied their motion to dismiss, explaining that "the mere fact that the Alabama Supreme Court has not extended the tort of outrage to a situation such as alleged in the Complaint does not, in and of itself, mean that it would not recognize the tort under the allegations of this case." *See* Order on Motion to Dismiss by Defendants Cagle and Keller, doc. 69 at 2. For this same reason, the court finds that defendants Investigator Turner and Officer Burnham's motion to dismiss the plaintiffs' tort of outrage claim is due to be denied.

**Plaintiffs' Claims for Money Damages under the Alabama Constitution of 1901**

The defendants argue that no private cause of action exists for violations of the Alabama Constitution under Alabama law; however, the third amended complaint did not appear to assert the violation of any rights under the Alabama Constitution. Accordingly, the court DENIES AS MOOT the defendants' motion to dismiss plaintiffs' claim for money damages under the Alabama Constitution.

**Plaintiffs' Official Capacity Claims Against Defendant Turner**

Investigator Turner argues that the plaintiffs may not assert any claims against him in his official capacity. In the plaintiffs' opposition brief, the plaintiffs explain that they did not make any specific claims against either Investigator Turner or Officer Burnham in their official

23

capacities, and concede that all claims are against these defendants in their individual capacities.

Accordingly, the court DENIES AS MOOT the defendants' motion to dismiss any claims against

Investigator Turner in his official capacity.

## V. CONCLUSION

For the reasons stated above, the court will DENY defendants Investigator Turner and

Officer Burnham's motion to dismiss. The court will simultaneously an order to that effect.

DONE and ORDERED this 6th day of December, 2011.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE